771 A.2d 759

**BFC HARDWOODS, INC., Appellant,**

v.

**BOARD OF ASSESSMENT APPEALS of CRAWFORD COUNTY, Appellee.**

Supreme Court of Pennsylvania.

Argued March 5, 2001.

Decided May 22, 2001.

---

David L. Hotchkiss, Meadville, for BFC Hardwoods, Inc.

Karen S. Johnson, Meadville, for Board of Assesstment Appeals of Crawford County.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, SAYLOR, JJ.

## OPINION

SAYLOR, Justice.

In this appeal, we consider whether certain kilns utilized to dry lumber are excluded from assessment for purposes of real estate taxation pursuant to the Fourth to Eighth Class County Assessment Law.

Appellant, BFC Hardwoods, Inc. ("BFC"), engaged exclusively in the business of drying lumber for commercial sale, utilizes five specialized kilns, described as dry kilns, in its operations in Bloomfield Township, Crawford County. The

County included the value of the kilns' structures in assessing BFC's real estate pursuant to Section 201 of the Fourth to Eighth Class County Assessment Law,[1] 72 P.S. § 5453.201, which generally describes the authorized subjects for real estate taxation by fourth to eighth class counties as follows:

All real estate, to wit: Houses, house trailers and mobile homes permanently attached to land or connected with water, gas, electric or sewage facilities, buildings, lands, lots of ground and ground rents, trailer parks and parking lots, mills and manufactories of all kinds, all office type construction of whatever kind, that portion of a steel, lead, aluminum or like melting and continuous casting structures which enclose, provide shelter or protection from the elements for the various machinery, tools, appliances, equipment, materials or products involved in the mill, mine, manufactory or industrial process, and all other real estate not exempt by law from taxation....

72 P.S. § 5453.201(a). BFC challenged the assessments before Appellee, the Board of Assessment Appeals of Crawford County ("the Board"), contending that its dry kilns should have been excluded pursuant to the following amendatory provision added to Section 201(a) of the Law in 1953:

Machinery, tools, appliances and other equipment contained in any mill, mine, manufactory or industrial establishment shall not be considered or included as a part of the real estate in determining the value of such mill, mine, manufactory or industrial establishment.

72 P.S. § 5453.201(a).[2] The Board agreed with the County's position that such exclusionary provision was inapplicable, and BFC lodged a statutory appeal in the court of common pleas pursuant to Section 704 of the Law, 72 P.S. § 5453.704.

The common pleas court viewed BFC's facilities and conducted a hearing, at which witnesses for BFC described the

1. Act of May 21, 1943, P.L. 571 (as amended 72 P.S. §§ 5453.101–5453.706)(the "Law").

2. This provision was added by the Act of July 17, 1953, P.L. 455 § 1, and made effective January 1, 1956, by the Act of July 28, 1953, P.L. 703 § 1.

physical characteristics and the operation of the kilns. The testimony, which was substantially uncontradicted, established that the kilns are used continuously and exclusively to remove moisture from pre-cut, green lumber to a greater degree than could be accomplished by conventional, open-air drying, thereby rendering the wood suitable for commercial sale and use in a broad range of applications which the wood would not otherwise support. The facility includes large, insulated physical structures (measuring 32 to 37 feet in width, 66 to 123 feet in length, and 22 feet in height) into which quantities of lumber are stacked, frequently for substantial time periods (depending upon the type of wood and customer requirements, the drying process may last from a few days to more than a month); three-million-BTU heating systems (frequently generating temperatures of 120 to 140 degrees Fahrenheit) to draw the moisture from the wood; and exhaust/ventilation systems designed to control airflow and eliminate saturated air from the enclosed structures. In addition to the main components, the dry kilns possess numerous additional specialized features, including computer controls and monitoring equipment to adjust interior environment conditions to facilitate even, efficacious drying; interior skins of aluminum alloy and other special alloy structural and non-structural components; concrete flooring capable of supporting concentrated loading; loading doors described as movable walls equipped to be hermetically sealed; systems of fans integrated into false ceilings, as well as bulkheads and baffles in the chambers, directing airflow; motorized roof vents; and high-pressure water-spraying systems employed to equalize the moisture content in the controlled environment. Assembly of the kilns was accomplished on the BFC premises utilizing pre-manufactured, pre-drilled components which can be disassembled for purposes of relocation. Three of the kilns were erected in 1993 and annexed, via plastic weatherproofing, to a storage building, whereas the remaining two were built freestanding in 1997. The dry kilns lack conventional services such as running water, sewage, or heating. From a witness with experience in the manufacture and marketing of dry kilns, BFC elicited testimony that these particular kilns are not well

suited to applications other than the drying of lumber, although the common pleas court did not permit extensive development of this line of questioning.[3] BFC's entire facility consists of the dry kilns, an office, storage buildings, and undeveloped real estate.

After the conclusion of the hearing, the common pleas court agreed with the Board that BFC's dry kilns were not excluded from assessment under Section 201(a) of the Law. In its opinion, the court emphasized its conclusion that the dry kilns are not "contained in" any mill, manufactory, or industrial establishment, but rather, constitute the *"sine qua non* of the business." Further, after acknowledging the Board's citation to a Commonwealth Court decision holding that, for purposes of the Capital Stock Tax Act,[4] the business of kiln drying lumber did not constitute manufacturing or processing, see *Commonwealth v. Babcock Lumber Co.,* 1 Pa.Cmwlth. 45, 272 A.2d 522 (1971), the court stated:

> We assume the inference the County wants to make from [this decision] is that *if* wood drying kilns are *not* manufacturing thus escaping the Pennsylvania Capital Stock Tax and they are *not* real estate (as BFC contends) then BFC ends up paying neither a corporate stock tax, nor a real estate tax on the main assets (kilns) that constitute their business. Perhaps this is a strained analogy, but one wonders if the kilns are *not* manufactu⸗ıg elements of the kiln drying business and are *not* real estate—just what are they?
>
> Apparently neither counsel nor the Court can find cases directly addressing the issue of whether drying kilns of this type in a narrowly focused business of this nature should be required to pay real estate taxes on the kilns that are the

3. After permitting a considerable amount of evidence to be placed on the record regarding the kilns, the court stated:

Counsel, I think the Court is satisfied that a drying kiln is a rather unique thing. And I don't think we need to go into the details.of this; as to how he thinks it's distinguishable from any other buildings.

4. Act of June 1, 1889, P.L. 420 (replaced and codified by the Tax Reform Code of 1971, Act of March 4, 1971, P.L. 6, No. 2, art. VI § 602 (as amended 72 P.S. §§ 7601–7606)).

sine qua non of their lumber drying business. The kilns and the ground they are attached to constitute the "business" BFC Hardwoods, Inc. is engaged in. The drying kilns are not machinery, tools or other equipment necessary to produce *another* product. The kilns *are* the "manufactory" or the "building" that produces the company's only product—dried lumber.

On further appeal, the Commonwealth Court affirmed in a memorandum opinion, adopting the reasoning of the common pleas court as its own.

Presently, BFC argues that the dry kilns qualify for exclusion from local real estate taxation as machinery or equipment contained in an industrial establishment, *see* 72 P.S. § 5453.201(a), since they are employed directly and solely to accomplish a form of industrial processing. BFC acknowledges that the dry kilns possess incorporated structural elements, but nevertheless, contends that controlling significance should be afforded to the functioning of each kiln as an integrated unit in the performance of BFC's sole industrial occupation. Citing this Court's seminal decisions in *In re Borough of Aliquippa (Jones & Laughlin Tax Assessment Case)*, 405 Pa.421, 175 A.2d 856 (Pa.1961), and *United States Steel Corp. v. Board of Assessment and Revision of Taxes*, 422 Pa. 463, 223 A.2d 92 (1966), BFC emphasizes that other structures bearing similarities to buildings yet integral to the operations of an industry have been deemed to qualify as machinery or equipment under Section 201 and analogous exclusionary provisions. More specifically, BFC posits that the integrated components of dry kilns perform a chemical process analogous to that involved in the refinement of oil, which was deemed to be a manufacturing process in *Gulf Oil Corp. v. City of Philadelphia*, 357 Pa. 101, 53 A.2d 250 (1947). According to BFC, the Commonwealth Court's *Babcock* decision is distinguishable on the ground that the Capital Stock Tax Act's exemption prescription for manufacturing and processing is considerably narrower in scope than the exclusion for industrial establishments prevailing under the Law. Finally, BFC cites an Internal Revenue Service revenue ruling

advising that dry kilns are not considered buildings for federal investment credit purposes, but rather, are essentially items of machinery or equipment for such purposes. *See* Rev. Rul. 69–557 1969–2 C.B. 3, 1969 WL 19060.

The Board, on the other hand, maintains that dry kilns do not qualify for the exclusion expressed under Section 201(a), as, it claims, they may be reasonably utilized for purposes other than the drying of wood, such as storage. Further, according to the Board, to qualify for the exclusion as machinery or equipment used in an industrial establishment under Section 201(a), a business must utilize raw elements to produce a new and different product, whereas, in its dry kilns, BFC does not alter the basic properties of wood, but rather, merely extracts moisture from it. The Board disputes BFC's assertion that evaporation entails a chemical process and highlights the common pleas court's citation to *Babcock,* 1 Pa.Cmwlth. at 45, 272 A.2d at 522, concerning the status of kiln drying for purposes of capital stock taxation.

█ As noted, Section 201(a) of the Law defines real estate broadly, to include many forms of buildings and structures, *see* 72 P.S. § 5453.201(a); further, Section 201(a)'s definitional term contains general language in the nature of a catch-all, *see id.* (encompassing "all other real estate not exempt by law from taxation"). The amendatory language of the statute, however, establishes an express exclusion where the following two requirements are met: 1) the property at issue must constitute machinery, tools, appliances, or other equipment; and 2) the property must be contained in a mill, mine, manufactory, or industrial establishment. 72 P.S. § 5453.201(a); *see Borough of Aliquippa,* 405 Pa. at 432, 175 A.2d at 862.[5]

5. That the amendment establishes an exclusion, as opposed to an exemption, is of particular significance since exemptions are evaluated according to a principle of strict construction in favor of taxation, *see* 1 Pa.C.S. § 1928(b)(5), whereas doubts are resolved in favor of the taxpayer in assessing the reach of the taxing statute in the first instance. *See generally Loeb Estate,* 400 Pa. 368, 372, 162 A.2d 207, 210 (1960)(stating that "[a]cts imposing a tax must be strictly construed against the Commonwealth and all reasonable doubt must be resolved

 Beginning with the latter of these criteria, while BFC does not purport that its facilities should be deemed to be a "mill" or "mine," and does not press the assertion that they constitute a "manufactory," its essential position is that the facilities do constitute an "industrial establishment." In defining such term, this Court has applied an approach emphasizing general usage and understanding. *See, e.g., North Side Laundry Co. v. Board of Property Assessment, Appeals and Review*, 366 Pa. 636, 640, 79 A.2d 419, 421 (1951)(stating that "[t]he law can do no better than to define an industrial plant as that type of establishment which the ordinary man thinks of as such"). Under this approach, the Court has determined, for example, that a commercial laundry is an industrial establishment, *see id.; United Laundries, Inc. v. Board of Property Assessment, Appeals and Review*, 359 Pa. 195, 201, 58 A.2d 833, 836 (1948),[6] and the intermediate appellate courts have concluded that newspaper plants and TV stations also would qualify. *See, e.g., Messenger Publishing Co. v. Board of Property Assessment, Appeals and Review*, 183 Pa.Super. 407, 409, 132 A.2d 768, 769 (1957)(endorsing the view of the common pleas court to the effect that "[i]t would seem that the ordinary man would think of a newspaper as an industrial plant, especially if one were to tell him that a laundry or a carpet cleaning company are such for the purpose here being considered"); *City of Pittsburgh v. WIIC–TV*

in favor of the taxpayer"); *see also City of Philadelphia v. Tax Review Bd. ex rel. Ace Dump Truck Service*, 158 Pa.Cmwlth. 402, 407, 631 A.2d 1072, 1074 (1993)("the rules of construction are clear that exclusions in tax statutes are to be strictly construed against the taxing body and in favor of the taxpayer to the extent that there is any reasonable doubt regarding the meaning of the statutory language"); *Golden Triangle Broad., Inc. v. City of Pittsburgh*, 31 Pa.Cmwlth. 547, 551, 377 A.2d 839, 842 (1977)(same), *aff'd*, 483 Pa. 525, 397 A.2d 1147 (1979).

6. In these cases, the Court was considering Section 201 of the General County Assessment Law, Act of May 22, 1933, P.L. 853 § 201 (as amended 72 P.S. § 5020–201). *See North Side Laundry*, 366 Pa. at 637, 79 A.2d at 421; *United Laundries*, 359 Pa. at 197, 58 A.2d at 834. The General County Assessment Law was repealed in part by the Law as it applied to fourth through eighth class counties. The present versions of both enactments incorporate identical exclusions for machinery and equipment contained in an industrial establishment. *Compare* 72 P.S. § 5020–201(a), *with* 72 P.S. § 5453.201(a).

*Corp.,* 14 Pa.Cmwlth. 18, 21, 321 A.2d 387, 388 (1974)(stating that "the same ordinary man would think of a TV station as an industrial establishment, especially if one were to tell him that a newspaper plant is such for the purpose here being considered").

Here, in describing the nature and scale of BFC's operations, the common pleas court clearly portrayed an industrial setting as contemplated by this Court's prior decisions. Indeed, in emphasizing its point that BFC's dry kilns are its core business asset, the common pleas court affirmatively indicated that "[t]hese kilns *are* essentially 'the industrial establishment' " (emphasis in original).[7] Although the common pleas

7. A historical perspective concerning Section 201's exclusionary provision also supports the conclusion that BFC's facilities constitute an industrial establishment. Prior to Section 201's effective date, the significance of this label was to invoke the "assembled industrial plant doctrine," fashioned by the judiciary, in the context of valuation and assessment decisions in local real estate taxation, to require the inclusion of machinery and equipment essential to the operation of a business, whether or not attached to the underlying realty, within the real estate assessment for an industrial enterprise. *See Borough of Aliquippa,* 405 Pa. at 425–26, 175 A.2d at 858–59. *See generally Voorhis v. Freeman,* 2 Watts & S. 116, 119 (Pa.1841)(articulating the assembled industrial plant doctrine as follows: "[w]hether fast or loose, therefore, all the machinery of a manufactory which is necessary to constitute it, and without which it would not be a manufactory at all, must pass for a part of the freehold"). This doctrine of liberal inclusion was applied not only to manufactories in the traditional sense, but also to other forms of businesses involved in production and processing of an industrial character. For example, in the laundry cases, the Court had determined that the machinery and equipment of commercial laundries, whether or not attached to realty, was subject to assessment. *See, e.g., North Side Laundry,* 366 Pa. at 639–40, 79 A.2d at 421. The General Assembly, however, devised the 1953 amendments to Section 201(a) to abolish this doctrine of *inclusion* in favor of a prescription which expressly required the *exclusion* of attached or unattached machinery or equipment for purposes of local real estate valuation and assessment, and this Court discerned that the clear legislative purpose was to provide a form of tax relief to encourage new industrial operations and retain existing ones within the Commonwealth. *See Borough of Aliquippa,* 405 Pa. at 429–30, 175 A.2d at 860–61. Since the General Assembly's initiative was responsive to the assembled industrial plant doctrine, we will construe its scope as at least concurrent with such doctrine in terms of the establishments to which it applies. *Accord Golden Triangle,* 31 Pa.Cmwlth. at 559, 377 A.2d at 845 (stating that "a commercial laundry has been held to be an industrial establishment although it is clearly not engaged in manufacturing," and "[t]he same

court focused upon the use in Section 201(a) of the phrase "contained in" to hold, effectively, that the kilns constitute too great a component of BFC's facility to merit their exclusion from assessment, we note that, in fact, the site also consists of office space, storage, and undeveloped real estate. More important, this Court has explained that the "contained in an industrial establishment" phraseology was employed by the Legislature precisely to *avoid* technical questions as to what constitutes industrial processing or manufacturing which had arisen from the General Assembly's use of the phrase "used in manufacturing" in other assessment statutes. *See id.* at 431, 175 A.2d at 861. Although we do not agree with BFC that the drying of lumber entails a chemical process in the sense of bringing about elemental changes in chemical composition,[8] it is undisputed that BFC employs large-scale, specialized implements to cause a substantial physical change in quantities of lumber by removing moisture more efficaciously than would be possible naturally. *Cf. Gulf Oil,* 357 Pa. at 111, 53 A.2d at 255 (noting that "[industrial] [p]rocessing is a flexible term and it may refer to either chemical *or physical* changes in the thing acted upon" (emphasis added)); *Baker v. Commonwealth,* 135 Pa.Cmwlth. 597, 605, 581 A.2d 1019, 1022 (1990)(indicating that "the plain, ordinary and usually understood conception of 'industrial operation' would comfortably include the processing of trees through a sawmill for the creation of rough lumber"). Based on the above, we find ample evidence to support the common pleas court's statement that BFC's facility constitutes an industrial establishment, thus satisfying one of the two requirements of the express exclusion contained in Section 201(a).[9] Although we acknowl-

would apply to any number of processing or research and development facilities").

8. As the Board notes, the *Gulf Oil* Court held that the chemical processes involved in the refinement of oil constituted manufacturing, *see Gulf Oil,* 357 Pa. at 108, 53 A.2d at 253. The analysis, however, was not an exclusive one, nor was it tailored to describing the broader category of industrial operations.

9. Indeed, the Board's decision to include only the value of the dry kilns' structure in its assessments represents an effective concession that at least certain components of the kilns constitute machinery or equip-

edge the Board's citation to *Babcock*, 1 Pa.Cmwlth. at 45, 272 A.2d at 522, we agree with BFC that the decision is distinguishable as defining a set of exclusions for purposes of capital stock taxation crafted more narrowly than the exclusion prevailing under the Law for purposes of local real estate taxation.[10]

The other criterion established by Section 201's exclusionary term requires that, to be free from assessment, property must constitute machinery or equipment. This, in turn, raises the question whether the entirety of each of BFC's dry kilns should be deemed excluded from assessment as machinery or equipment, or whether the exclusion should be limited to some portion of the kilns' components, as the Board has attempted. In *Borough of Aliquippa*, this Court described the machinery and equipment of an industrial establishment to be excluded from taxation as follows:

> improvements, whether fast or loose, which are used *directly* in manufacturing the products that the establishment is

ment contained in an industrial establishment. While the Board attempts to justify a distinction between the structures and implements based upon the Superior Court's decision in *Appeal of Penn–Lehigh Corp.*, 191 Pa.Super. 649, 159 A.2d 56 (1960), determining that bowling lanes and associated substructures were not part of the underlying realty, the holding in that case reflected an application of conventional property-law principles. *See id.* at 654–55, 159 A.2d at 59 (emphasizing that "there was no physical attachment of the alleys to the building and ... they could be removed without any physical damage to the alleys themselves or the building in which they were located"). The Board, however, did not offer evidence to establish that the many integrated implements constituting dry kilns are similarly separable from the structures such as might render *Penn–Lehigh*'s analysis relevant.

10. The Capital Stock Tax Act exempts from certain of its provisions the capital stock of corporations "organized for manufacturing, processing, research or development purposes." 72 P.S. § 7602(a). The concept of "processing" is specifically limited, under Section 601, to seventeen enumerated business enterprises, *see* 72 P.S. § 7601, *see also Babcock*, 1 Pa.Cmwlth. at 52–53, 272 A.2d at 526–27, as distinguished from the considerably broader definition ascribed to an industrial enterprise for purposes of exclusion from local real estate taxation. *See, e.g., United Laundries*, 359 Pa. at 201, 58 A.2d at 836. Additionally, the manner of interpretation applied is distinct, as the Capital Stock Tax Act has been construed as providing an *exemption* for manufacturing and processing, whereas the Law is interpreted as providing an *exclusion* for manufacturing and other industrial establishments. *See supra* note 5.

intended to produce and are necessary and integral parts of the manufacturing process and are used *solely* for effectuating that purpose, are excluded from real estate assessment and taxation. On the other hand, improvements which benefit the land generally and which may serve various users of the land, are not in this category. Neither are structures which are not necessary and integral parts of the manufacturing process and which are separate and apart therefrom within the exclusion.

*Borough of Aliquippa*, 405 Pa. at 431–32, 175 A.2d at 861; *see also id.* at 428, 175 A.2d at 860 (stating that "the true test was whether the machinery 'was palpably an integrant part of a manufactory or a mill', i.e. 'was necessary to constitute it and without which it would not be a manufactory at all' " (quoting *Voorhis*, 2 Watts & S. at 116)); *Gulf Oil*, 357 Pa. at 108–09, 119, 53 A.2d at 253–54, 258 (endorsing a modern conception of machinery as effectively the apparatus essential to actual industrial operations and emphasizing that such broad construction was consistent with the legislative policy of fostering business development in the Commonwealth). In applying such interpretation, this Court has concluded that foundations supporting and structures enclosing coal bins, coke ovens, blast furnaces, and other heavy machinery incident to a steel mill are excludable from real estate taxation under Section 5453.201 as machinery. *See Borough of Aliquippa*, 405 Pa. at 429, 175 A.2d at 860 (describing certain structures and foundations as "absolutely essential integral parts of each machine ... without which its operation would be rendered impossible"); *United States Steel*, 422 Pa. at 472, 223 A.2d at 97 (describing as "vast machines" a sintering plant, ore screening station, and coke oven and indicating that "the roof and siding on each are parts of the machinery and would collapse if the inner machinery were removed"); *see also Gulf Oil*, 357 Pa. at 108–19, 53 A.2d at 255–58 (classifying as machinery tanks in which physical and chemical processes occur that are necessary to processing oil); *Gordon Lubricating Co. v. Board of Property Assessment, Appeals and Review*, 204 Pa.Super. 441,

444–45, 205 A.2d 704, 706 (1964)(same), *aff'd,* 418 Pa. 625, 211 A.2d 284 (1965).

The evidence presented and the common pleas court's findings, including that BFC's dry kilns are the *sine qua non* of the industrial establishment, indicate that the entirety of the kilns, including the specialized physical structure, the chamber, and the associated components, are necessary and integral, functional parts of the industrial process. *Cf.* Rev. Rul. 69–557 1969–2 C.B. 3 (concluding that dry kilns "are comparable to the shells or chambers of an oven, or of a gas tank, and as such are inseparable parts of (and essentially are) items of machinery or equipment"). BFC proffered extensive evidence to the effect that practical and economical use of the dry kilns is restricted to the particular purpose for which they were constructed and, thus, they do not benefit the land in a general sense as would a conventional building. The common pleas court made no finding to the contrary (indeed, it appeared to accept the conclusion we have reached, *see supra* note 3); further, the Board offered insufficient evidence to adequately support its contention that the kilns could be practically used for storage.[11]

Accordingly, we hold that BFC's dry kilns constitute machinery contained in its industrial establishment for purposes of Section 201(a) of the Law, and thus are excluded from real estate taxation under its provisions.

The order of the Commonwealth Court is reversed, and the case is remanded for further proceedings consistent with this opinion.

Justice NIGRO and Justice NEWMAN did not participate in the consideration or decision of this case.

11. The Board's sole citation to the record is to a statement by BFC's expert on direct examination to the effect that, "I mean if you stretched it, you could store furniture in one I suppose[;][b]ut it would be pretty expensive storage."